IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 04 C 3020 |
| THOMAS TOWNE, JOEN TOWNE, | ) | |
| JANE HARRIS, PETER SWAN, and | ) | |
| CITIMORTGAGE, INC., as assignee of | ) | |
| FIRST ILLINOIS MORTGAGE, | ) | |
| SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

The Court previously entered judgment in the amount of $329,336.10 against Defendant

Taxpayers Thomas and Joen Towne ("Townes" or "Taxpayers") for their unpaid federal income

tax liabilities.  Presently, Plaintiff United States of America ("United States" or "Government")

seeks to secure the Townes' federal income tax liability by foreclosing federal tax liens

pertaining to certain real property located in Libertyville, Illinois.  Defendants Jane Harris and

Peter Swan contend that the Townes have no interest in the real property at issue.  Defendant

Citimortgage contends that if the United States' tax liens did not attach to the subject property,

its mortgage on the real property has priority over the United States.  Before the Court are the

parties' cross-motions for summary judgment.[1]  For the following reasons, the Court denies the

United States' and Swan and Harris' Motions for Summary Judgment.  Because the Court cannot

---

[1]  The Townes did not file a Motion for Summary Judgment nor have they joined in any
of the other motions before the Court.

determine which tax liens, if any, attached to the subject property, the Court also denies

Citimortgage's Motion for Summary Judgment.

## BACKGROUND[2]

### A. Introduction

The Townes have unpaid federal income tax liabilities for tax years 1988, 1989, and

1993-1999, the combined total of which is $329,336.10. (R. 49-1, United States Rule 56.1

Statement of Facts, ¶ 6.) The Townes presently live in the subject property that is commonly

referred to as 29505 Oak Spring Lane, Libertyville, Illinois (the "Property"). (U.S. Stmt. ¶ 7; R.

34-1, Harris & Swan Rule 56.1 Statement of Facts, ¶ 5.) Thomas Towne held legal title to the

Property until April 27, 1987, when the Property was sold at a foreclosure sale by court order in

an Illinois state court action entitled *Home Federal Serv. Corp. v. Thomas Towne*. (H&S Stmt. ¶

6.) Home Federal Service Corporation ("Home Federal") purchased the Property through the

foreclosure sale. (*Id.* ¶ 7.) On November 13, 1987, a sheriffs' deed was issued to Home Federal.

(*Id.*)

### B. Sheldon Jack Shull's Agreement with Towne

On March 10, 1988, Sheldon Jack Shull purchased the Property and received the title

from Home Federal. (*Id.* ¶ 8.) Shull then entered into a lease agreement with Thomas Towne.

(*Id.* ¶ 9.) The Government contends that Shull and Thomas Towne's agreement not only

_____

[2] The Court derives the facts in the background section from the parties' Northern District of Illinois Local Rule 56.1 Statements of Fact. Facts in the parties' statements that are not controverted are deemed admitted. *Smith v. Lamz,* 321 F.3d 660, 683 (7th Cir. 2003). Responses that do not cite to specific references to the affidavits, depositions, and other supporting materials are subject to the Court's discretion as to their admission. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).

concerned the Property, but also a debt that Towne owed Shull. (R. 41-1, United States Statement of Additional Facts, ¶¶ 2, 3.) Nonetheless, once Thomas Towne failed to make the required monthly payments pursuant to the parties' agreement, Shull filed a state court complaint for forcible entry and detainer against Thomas Towne seeking the eviction of Thomas and Joen Towne from the Property. (H&S Stmt. ¶ 10.)

C. **Mary V. Sams Revocable Trust's Agreement with the Townes**

On March 13, 2001, the Mary V. Sams Revocable Trust ("Sams Trust") purchased the Property from Shull for $219,000. (*Id.* ¶ 11.) Mary Sams is the mother of Defendant Joen Towne. (*Id.* ¶ 13.) Thomas and Joen Towne then entered into an agreement with the Sams Trust relating to the Property. (*Id.* ¶ 14.) By September 2002, the Townes had defaulted on their agreement with the Sams Trust. (*Id.* ¶ 15.) At that time, the Sams Trust, through its agent John Loeffler, who is Mary Sams' son and Joen Townes' brother, hired a law firm to begin eviction proceedings. (*Id.*) On September 20, 2002, Mary Sams, as trustee of the Sams Trust, filed a complaint for forcible entry and detainer in state court against the Townes seeking possession of the Property. (*Id.* ¶ 16; U.S. Stmt ¶ 8.) Defendant Peter Swan represented the Townes in the state court action. (U.S. Addl. Facts ¶ 9.) On November 20, 2002, the Townes filed a counterclaim against the Sams Trust. (H&S Stmt. ¶ 17.)

On April 3, 2003, the parties reached a settlement in the state court action, which was described by the Illinois state court judge, Terrance Brady, as follows:

> The first portion of the agreement is the fact that [the] Mary Sams Trust from this settlement agreement will receive the principal amount of $290,000.

> To effectuate that, the Townes would be given the exclusive right to sell the subject property, market it in any manner they choose for a four-month period beginning Monday [April 7, 2003].

3

From that four-month marketing period and sale period, Mary Sams will be entitled to receive $290,000, plus any mortgage payments that she shall pay after June [1, 2003] ...

...

After that four-month period the Mary Sams Trust shall have the exclusive right to market the property, and from that, sale proceeds received for $290,000, plus any monthly mortgage payments accrued.

...

At the sole discretion of the Mary Sams Trust, after the fourth-month period, [sic] shall additionally be entitled to possession of the property should she deem that to be her desire at that time.

And to obtain that possession, the Trust shall be entitled to come before this Court requesting immediate order of possession, and the Defendants-Counterclaimants [Townes], herein waive the right to contest that possession.

(*Id.* ¶ 19, Swan Aff., Ex. 9).  As such, under the terms of the settlement agreement, if the Townes found a buyer during the fourth-month period who was willing to pay in excess of the amounts due the Sams Trust, the Townes would be entitled to these excess funds.  (*Id.* ¶ 20.)

**D.      Jane Harris Purchases the Property**

On August 1, 2003, Jane Harris, as trustee under Trust #29505, and the Sams Trust entered into a real estate sales contract.  (*Id.* ¶ 22.)  The beneficiaries of Trust #29505 are Harris and Peter Swan, who are married.  (*Id.* ¶¶ 17, 22.)  The sales price was a sum equal to the amount due the Sams Trust pursuant to the state court order of April 3, 2003.  (*Id.*)  That same day, the parties informed the Sams Trust attorneys of the execution of the sales contract for the Property.  (*Id.* ¶ 23.)  The purchasers then requested to schedule a closing date.  (*Id.*)  At that time, the Sams Trust took the position that the closing date had to occur by August 4, 2003.  (*Id.*)

On August 5, 2003, the Sams Trust filed a motion for order of immediate possession of

the Property because the Townes had not sold or vacated the premises pursuant to the April 3, 2003 settlement agreement. (*Id.* ¶ 24; U.S. Stmt. ¶ 12.) The Townes filed their objection to the motion for immediate possession contending that a sales contract had been entered into prior to August 4, 2003, and that the Sams Trust failed to cooperate to finalize the closing. (H&S Stmt. ¶ 24.)

On August 12, 2003, Judge Brady entered an order granting the Sams Trust possession of the Property, but stayed the enforcement of the order until August 15, 2003. (U.S. Stmt. ¶ 14; H&S Stmt. ¶ 25.) The judge also granted the purchasers forty-eight hours to close the sale of the Property and to tender the amounts to the Sams Trust. (H&S Stmt. ¶ 25.) On August 13, 2003, Harris tendered a cashiers check in the amount of $296,000.96 to the Sams Trust attorneys. (*Id.* ¶ 26; U.S. Stmt. ¶ 15.) Swan signed the cover letter to the cashiers check stating: "Enclosed herein please find a check in the amount of $296,000.96 payable to the Mary Sams Trust, tendered pursuant to court order and in consideration of the issuance of a Trustee's Warranty Deed from the Mary V. Sams revocable trust dated 12-4-96, as grantor, to Jane E. Harris as Trustee under Trust #29505 dated August 13, 2003, and the release of all mortgages against the subject property as originated by the Mary Sams Trust." (U.S. Stmt. ¶ 15.)

Despite the fact that Harris tendered the payment under the terms of the real estate purchase agreement, the Sams Trust initially refused to tender the Property's title to Harris. (H&S Stmt. ¶ 27.) Thus, the Townes moved the state court for enforcement of the settlement agreement and the state court's August 12, 2003 order. (*Id.* ¶ 28.)

On August 27, 2003, Judge Brady conducted a hearing in state court regarding the motion to stay proceedings and the Townes' motion for an order to enforce the settlement

agreement.  (*Id.* ¶ 35.)  At that time, Judge Brady denied the motion to stay the proceedings and directed the Sams Trust to issue a Trustees Deed to Harris.  (*Id*.)

### E.      IRS Involvement

On or around August 13, 2003, the Internal Revenue Service ("IRS") learned of the state court action between the Townes and the Sams Trust and started to actively monitor it.  (*Id.* ¶ 29, Swan Aff., Ex. 18.)  Revenue Officer Lawrence Kagan contacted the attorneys for the Sams Trust and eventually talked to Loeffler, who explained the litigation between the Sams Trust and the Townes.  (*Id.* ¶ 30.)  On or around August 14, 2003, Kagan caused tax levies to be served upon representatives of the Sams Trust, including Swan, concerning the Townes' tax liabilities. (*Id.,* Swan Aff., Ex. 19.)

On August 27, 2003, Kagan had a conference with Swan.  (*Id.* ¶ 36.)  Kagan described the meeting as follows:  "Peter Swan explained the case to me, he will send a time line too. Taxpayer was supposed to buy the property from his mother-in-law for $296,000.  Jane Harris, attorney from Joliet, wanted to buy the house and lease it back to taxpayer.  Funds were tendered to the Mary Sams Trust, Court ordered today in State Court to the Trust, this was above board transaction that had to be issued to Jane Harris."  (*Id.*)

### F.      Federal Interpleader Action

Meanwhile, on August 22, 2003, the Sams Trust filed a complaint for interpleader in the United States District Court for the Northern District of Illinois, Case Number 03 C 5912.  (*Id.* ¶ 32.).  Judge Marvin Aspen was the presiding judge in the matter.  `(*Id.*)  The federal lawsuit sought to interplead the Property and funds, which were subject to the tax levy, and for adjudication as to the rights and obligations of all parties as to the funds, the Property, and the

tax levy.  (*Id.* ¶ 33.)  On the same day the federal lawsuit was filed, the Sams Trust filed a motion

to stay proceedings in the state court action.  (*Id.* ¶ 34.)  The Sams Trust alleged that conveying

the Property when a notice of levy was in place would subject the Sams Trust to liability with the

IRS.  (*Id.*)

Once Harris discovered that the Sams Trust had filed an interpleader complaint in federal

court, she filed a motion to intervene in the action.  (*Id.* ¶ 37.)  On August 27, 2003, the Sams

Trust filed an emergency motion in the federal case requesting the district court to stay all

actions until such time as the federal court entered a ruling on the interpleader action.  (*Id.* ¶ 38.)

On August 29, 2003, the Sams Trust filed a motion in the federal district court to voluntarily

dismiss its complaint.  (*Id.* ¶ 39.)  The Sams Trust sent the motion for voluntary dismissal to

Kagan, another IRS official, a United States Justice Department official, the Townes, and Swan

as attorney for Harris.  (*Id.*)  The rationale for voluntarily dismissing the federal lawsuit was that

the Government indicated that the IRS would withdraw the notice of levy letter it issued to the

Sams Trust.  (*Id.*)

**G.      Quitclaim Deed & Agreement with the Townes**

On September 3, 2003, the Sams Trust conveyed a quitclaim deed to Harris as Trustee of

Trust #29505  (U.S. Stmt. ¶ 19.)  Harris and Swan then entered into an agreement with the

Townes entitled "Agreement for Option to Purchase Real Property," in which the Townes were

allowed to reside on the Property through August 30, 2005.  (*Id.* ¶ 21.)  The agreement stated

that "the TOWNES are hereby granted by SELLER the exclusive right to purchase the Property

from SELLER, or any party that obtains title to the Property through SELLER, during the period

ending August 30, 2005 (the 'purchase option period').  After August 30, 2005 the exclusive

right to purchase shall lapse." (*Id.*, Ex. 12, at 1-2.)

### H. Tax Liens

Prior to August 2003, the United States filed two general notices of liens against the Townes for their unpaid taxes. (*Id.* ¶ 6, Exs. 1a, 1b.) The IRS filed these liens with the Recorder of Deeds in Lake County, Illinois in 1994 and 1997. (*Id.*, Exs. 1a, 1b.) The IRS assessed some of the unpaid taxes as early as 1990. (*Id.*) On August 29, 2003, the United States also filed a "Notice of Federal Tax Lien" naming the Mary V. Sams Revocable Trust as Nominee of Thomas Towne and another "Notice of Federal Tax Lien" naming the Mary V. Sams Revocable Trust as Nominee of Thomas and Joan Towne. (*Id.* ¶ 19, Exs. 10a, 10b.)

### I. Citimortgage

On December 9, 2003, First Illinois Mortgage made a loan to Harris and Swan in the sum of $227,500 secured by a mortgage on the Property. (R. 60-1, Citimortgage Rule 56.1 Statement of Facts ¶ 27.) Thereafter, First Illinois Mortgage assigned the mortgage to Citimortgage. (*Id.*)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material fact exists, the Court construes all facts and reasonable inferences in a light most favorable to the non-moving party. *Id.* at 255. As such, on

cross-motions for summary judgment, the Court construes all the facts and reasonable inferences in favor of the party against whom the motion under consideration is made. *Tegtmeier v. Midwest Operating Eng'r Pension Trust Fund,* 390 F.3d 1040, 1045 (7th Cir. 2004). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion. *Butts v. Aurora Health Care, Inc.,* 387 F.3d 921, 924 (7th Cir. 2004). Instead, the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Id.*

## ANALYSIS

Once the amount of a tax liability has been established and recorded, the IRS may employ administrative enforcement methods, such as tax liens, to collect the outstanding taxes. *United States v. Galletti,* 541 U.S. 114, 122, 124 S.Ct. 1548, 1551, 158 L.Ed.2d 279 (2004). A federal tax lien attaches to "all property and rights to property, whether real or personal," that belong to the taxpayer. *See* 26 U.S.C. § 6321; *In re Carlson,* 126 F.3d 915, 924 (7th Cir. 1997). Section 6323(a) of Title 26, establishes that federal tax liens shall not be valid against "[p]urchasers, holders of security interests, mechanic's lienors, and judgment lien creditors until notice thereof which meets the requirements of subsection (f) has been filed by the Secretary." *See Straus v. United States*, 196 F.3d 862, 865 (7th Cir. 1999). Under Section 6323(h)(6), a purchaser is defined as, "a person who, for adequate and full consideration in money or money's worth, acquires an interest (other than a lien or security interest) in property which is valid under local law against subsequent purchasers without actual notice." 26 U.S.C. § 6323(h)(6).

To determine whether a taxpayer has "property" or "rights to property" under Section 6321, the Court turns to Illinois law to "to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Drye v. United States,* 528 U.S. 49, 58, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999); *see also United States v. Davenport,* 106 F.3d 1333, 1335 (7th Cir. 1997) ("State law determines what interest a taxpayer has in property"). Accordingly, whether the taxpayer has a right to property is ultimately a question of federal law. *United States v. Craft,* 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002); *see also United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958) (federal tax lien statute "creates no property rights but merely attaches consequences, federally defined, to rights created under state law").

I.      **United States' Motion for Summary Judgment**

A.      **Relevant Tax Liens**

Because the United States fails to give the Court sufficient guidance as to the tax liens it seeks to foreclose, the Court turns to this issue first. On August 29, 2003, the Government filed two nominee tax liens naming the Sams Trust as nominee for the Townes. It is well-established that the United States can enforce a taxpayer's liability against "property" or "rights to property" that are held for him by a nominee or alter ego. *See G.M. Leasing Corp. v. United States,* 429 U.S. 338, 351, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). The Government, however, has failed to develop their argument that the Sams Trust was a nominee (or alter ego) of the Townes. As such, the Government has waived this argument. *See Estate of Moreland v. Dieter,* 395 F.3d

747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived").[3]  Because the Government has waived this argument, the August 29, 2003 nominee liens are not at issue in this matter.

The Government also filed two general notices of liens, also known as assessment liens, against the Townes for their unpaid taxes.  According to the documents provided by the Government, the IRS recorded these general liens with the Recorder of Deeds in Lake County, Illinois in 1994 and 1997, although the IRS assessed some of the taxes as early as 1990.  A tax lien attaches at the time of the assessment, *see Davenport,* 106 F.3d at 1336, yet the Government does not explain how it can foreclose on taxes that fall outside the ten year statute of limitations period.  *See* 26 U.S.C. § 6502(a)(1) (timely assessed "tax may be collected ... within 10 years after the assessment of the tax").  Furthermore, it is unclear from the record whether the Government gave notice of the tax assessments and demanded payment as required under 26 U.S.C. § 6303.  *See Davenport,* 106 F.3d at 1336.  Finally, the Government does not explain how the Townes' tax liabilities representing tax years 1988 through 1999 could attach to the Property because the Townes have not held legal title to the Property since 1987, and thus were not in the chain of title when the IRS filed the notice of liens with the Recorder of Deeds in Lake County.

Without more guidance from the Government, it remains unclear how it can foreclose on the tax lien assessed in May 1990 in the amount of $55,732.89, whether the Government gave the taxpayers proper notice of the general tax liens and demanded payment, and how the general tax liens can attach to Property when the Townes were not in the chain of title at the time the IRS

_____

[3] Although Swan and Harris contend that the Government has abandoned its nominee lien theory, the Government never directly concedes this point.

assessed and filed the general tax liens.

Despite the confusion concerning the tax liens, the Court turns to the Government's substantive arguments in support of its summary judgment motion.

**B.      Equitable Title**

The United States first argues that – setting labels aside – since the April 3, 2003 settlement agreement, the Townes have had the same right to the Property as if they had purchased the Property on a land contract or subject to a mortgage.  *See Craft*, 535 U.S. at 279 ("In looking to state law, we must be careful to consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them.").  More specifically, the Government contends that pursuant to the settlement agreement, the Townes had the right (1) to the possession of the Property, (2) to have legal title transferred to them upon satisfaction of their monetary obligations to the Sams Trust, (3) to the appreciation of the Property, and (4) to direct the transfer of the Property.  From these contentions and the case law that the Government cites, it appears that the Government is arguing that the Townes had equitable title to the Property to which the tax liens may attach.  *See Illinois Nat'l Bank of Springfield v. Gwinn,* 390 Ill. 345, 356, 61 N.E.2d 249 (Ill. 1945) ("equitable ownership is regarded by equity as the real ownership"); *Kindred v. Boalbey,* 73 Ill.App.3d 37, 29 Ill.Dec. 77, 391 N.E.2d 236 (Ill.App.Ct. 1979) (applying doctrine of equitable conversion to installment real estate contract).  The Court thus turns to the doctrine of equitable conversion under Illinois law.

In Illinois, "when the owner enters into a valid and enforceable contract for the sale of realty, the seller continues to hold legal title, but in trust for the buyer; the buyer becomes the equitable owner and holds the purchase money in trust for the seller."  *In re Estate of Martinek,*

140 Ill.App.3d 621, 628, 94 Ill.Dec. 939, 488 N.E.2d 1332 (1986) (citing *Shay v. Penrose*, 25 Ill.2d 447, 449-50, 185 N.E.2d 218 (Ill. 1962)).  In other words, equitable conversion takes place when the parties enter into a valid real estate sales contract at which time the buyer acquires an equitable title.  *See Shay,* 25 Ill.2d at 450.  The doctrine of equitable conversion, however, does not apply where there are other equitable considerations or the parties intend otherwise.  *Ruva v. Mente*, 143 Ill.2d 257, 264, 157 Ill.Dec. 424, 572 N.E.2d 888 (Ill. 1991).

Despite its initial argument that the Townes have the same right to the Property as if they had purchased the Property on a land contract, the Government fails to apply the facts of this case to the law of equitable conversion.  Instead, the Government argues:

> At the time the Taxpayers had the right to a full fee simple interest in the property upon the repayment of the $296,000.96, they marketed their interest in the subject property to Defendant Swan and Harris.  Taxpayer Thomas Towne signed a contract to sell, and Defendant Harris signed a contract to purchase, the subject property on August 1, 2003, even though the property was subject to federal tax liens, notice of which had been recorded before August 2003 (or April 2003, for that matter).  Thus, when Defendants Swan and Harris paid the Sams Trust the $296,000.96, thereby satisfying the one interest in the property that was senior to the United States' interest, they gave rise to the Taxpayer's unconditional right to direct title to the subject property, albeit because of the August 1, 2003, contract, the Taxpayers had a new duty to convey the property – which was subject to federal tax liens – to Defendants Swan and Harris.  Thus, Defendant Swan and Harris took the property subject to the federal tax liens.

(R. 46-1, Memorandum of Law in Support of United States of America's Motion for Summary Judgment, at 5-6.)

The Government's argument is perplexing.  The Government is asking the Court to make unreasonable inferences based on facts that are not supported by the record or facts that are in dispute.  For example, there is no evidence in the record that Thomas Towne and Harris entered into a real estate contract on August 1, 2003, as the Government implies.  Instead, the record

reflects that Harris, as trustee under Trust #29505, and the Sams Trust entered into a real estate sales contract on that date. The sales price was a sum equal to the amount due the Sams Trust pursuant to the state court order of April 3, 2003, more specifically, $296,000.96. Harris then tendered a cashiers check in the amount of $296,000.96 to the Sams Trust attorneys.

Furthermore, the Government never establishes its initial premise – that the Taxpayers had the right to a full fee simple interest in the Property upon the repayment of the $296,000.96 to the Sams Trust. The Government's bare-boned assertion that the Townes had the same rights to the Property as if they had purchased the Property on a land contract or subject to a mortgage does not establish that the Townes had "property" or "rights to property" as required under Section 6321. Viewing the facts and inferences in a light most favorable to Swan and Harris, the Court denies the United States' motion for summary judgment based on this argument.

### C.      Power to Direct Title

In the alternative, the Government argues that even if the taxpayers did not actually own the Property, pursuant to the April 2003 settlement agreement, the Townes had the power to direct where the Property's title should be transferred and, as such, this power to direct is subject to the federal tax liens. First, the Government's assertion that the Townes had the power to direct the Property's title is factually disputed. The Government contends that the Townes had the power to direct based on their letter to the Sams Trust in which they requested that the Property's deed be issued to Harris. Swan and Harris contend, however, that because the April 2003 settlement agreement does not mention the power to direct, it plainly does not grant the Townes the power of direction.

Even if the Court were to assume that the settlement agreement gave the Townes the right

to direct the Property's title, the Government's reliance on the Supreme Court decisions in *Drye* and *Craft* to support its contention that this right is a property right under Section 6321 is misplaced. In *Craft*, the Supreme Court determined that Michigan law granted a tenant by the entirety many of the essential rights to the use of property, namely, to receive income produced from the property and to exclude others from it. *Craft,* 535 U.S. at 283. The Supreme Court further determined that the tenant by entirety also had the right to alienate or otherwise encumber the property, that is, to "dispose" of the property, with the consent of his wife, and the right to survivorship. *Id.* at 283-84. Based on the tenant in entirety's various property rights as described above, the *Craft* Court concluded that the husband had "property rights" under Section 6321, despite the fact that he could not unilaterally alienate the property. *Id.* at 284-85. In making its determination, the *Craft* Court looked to the breadth of control the taxpayer exercised over the property and concluded that the husband in the tenancy in entirety had a "a substantial degree of control" over the subject property. *See id.* at 283.

Here, the Government does not explain how the power to direct title gave the Townes a "substantial degree of control" over the Property. In fact, the Government admits that the power to direct was contingent on the satisfaction of the obligation to the Sams Trust, that is, payment of $296,000.96. Thus, the Court would be hard-pressed to conclude that the power to direct title gave the Townes the same property rights as the tenants in entirety in *Craft* due to this contingency along with the absence of any other rights to use of the property as described in *Craft*.

The United States also relies on the *Drye* decision for the proposition that the Townes' right to direct title was a property interest to which the tax liens could attach. In *Drye*, the

Supreme Court concluded that under Arkansas law, the taxpayer's right to channel his inheritance to a close family member constituted a property right under Section 6321. *Id.* at 61. Specifically, the Supreme Court held that because the taxpayer had the unqualified right to receive the entire value of his mother's estate, he had sufficient control over the property to which the federal tax liens could attach. *Id.* The *Drye* decision is factually distinguishable because unlike the Townes, the taxpayer in *Drye* had the unqualified right to receive the subject property. Again, under the Government's theory, the Townes did not have the unqualified right to the real estate until they paid $296,000.96. Thus, the *Drye* decision does not lend support to the Government's argument.

Accordingly, the Government has failed to substantiate its argument that the Townes' power to direct title is a property right to which the tax liens can attach.

### D. Option to Purchase Property

Next, the Government argues that pursuant to the April 3, 2003 settlement agreement, the Townes had an "option" to purchase the Property, and thus the tax liens attached to this option. Even if the Court were to assume that the settlement agreement created an option to purchase the Property, under Illinois law, an option is not a sale or a contract of sale and does not convey legal title. *Fried v. Barad,* 175 Ill.App.3d 382, 391, 125 Ill.Dec. 175, 530 N.E.2d 93 (Ill.App.Ct. 1988). As such, an optionee does not have an interest in the land until he exercises his option to purchase the property *See id.*

Here, there is no evidence in the record that the Townes exercised their option, despite the Government's assertion that they did so. Nonetheless, the Government relies on a District of Utah case to support its argument that a tax lien can attach to an option to purchase property.

16

*See Gramercy Enter. v. United States,* 643 F.Supp. 687 (D. Utah 1986).  The holding in *Gramercy,* however, does not support the Government's argument because the Utah district court held that once the taxpayer *exercised* its exclusive, non-assignable option to purchase property, the tax lien attached to that property.  *Id.* at 690.

The Government also relies on a Sixth Circuit case in which the court concluded that a tax lien attached to property once the taxpayer exercised its option and entered into a contract to the purchase property.  *See United States v. Big Value Supermarkets, Inc.*, 898 F.2d 493, 497 (6th Cir. 1990) (applying Ohio law to land installment contract).  Again, *Big Value Supermarkets* does not support the Government's argument because there is no evidence in the record that the Townes exercised their "option" to purchase the Property nor that the Townes subsequently entered into a contract to purchase the Property.

Accordingly, the United States' argument that the tax lien attached to the Townes' "option" to purchase the Property fails because under Illinois law, options, standing alone, are not "property or "rights to property" as required under Section 6321.  *See Drye,* 528 U.S. at 58 (courts look to state-delineated rights to determine if rights qualify as "property" or "rights to property" within the context of federal tax lien legislation).  Accordingly, this argument fails as a matter of law.

E.      **August 12, 2003 State Court Order**

Finally, in its summary judgment motion, the United States contends that the Townes had property rights in the Property based on the state court order of August 12, 2003.  The United States relies on the handwritten order memorializing Judge Brady's directive granting the Sams Trust possession of the Property, but staying the enforcement of the order for forty-eight hours

so that the purchaser could close on the sale of the Property with the Sams Trust. In the handwritten order, certain language is crossed out and other language is inserted concerning the payment of funds to the Sams Trust. The new language states that "once payment clears (upon certification of funds clearing) Plaintiff shall tender the Trustees' deed to defendants."

Based on this order, the Government argues:

> [P]ursuant to the August 12, 2003, state court order, for 48 hours the Taxpayers, and only the Taxpayers, had a right to receive a deed to the property in exchange for a payment of $296,000.96 to the Sams Trust. And payment was made, albeit not by the Taxpayers. Irrespective of that fact, the state court order stated that the Taxpayers, at that point in time, had a right to the deed. And federal tax liens attached to the deed at that point in time.

(United States' Memorandum, at 13.) The Government fails to cite any legal authority in support of this proposition. Further, the Government does not articulate how the opportunity to purchase property constitutes "property" or "rights to property" as required by Section 6321. Viewing the facts and all reasonable inferences in a light most favorable to Swan and Harris, the United States' argument, based on the August 12, 2003 state court order, fails. The Court thus denies the United States' summary judgment motion in its entirety.

## II.     Swan & Harris' Motion for Summary Judgment

In their summary judgment motion, Swan & Harris contend that the Sams Trust is not a nominee for the Townes, and thus the nominee tax liens did not attach to the Property. Because the United States has waived its nominee lien theory, the Court need not address this issue. Nevertheless, Swan and Harris also contend that Government had unclean hands and that the Court should estop the Government from foreclosing on the Property based on the Government's

alleged misconduct.[4]

**A.    Unclean Hands**

"The unclean hands doctrine provides that a party to a lawsuit may not obtain the relief it seeks if it has engaged in wrongful conduct." *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002) (citing *Eichmann v. National Hosp. & Health Care Servs., Inc.,* 308 Ill.App.3d 337, 241 Ill.Dec. 738, 719 N.E.2d 1141, 1145 (Ill.App.Ct. 1999)).  To determine whether a party acted with unclean hands, the Court looks to the intent of that party and will only find unclean hands if there is evidence of fraud or bad faith.  *Schivarelli v. Chicago Transit Auth.,* 355 Ill.App.3d 93, 103, 291 Ill. Dec. 148, 823 N.E.2d 158 (Ill.App.Ct. 2005).

Here, Swan and Harris have failed to present any evidence establishing fraud or bad faith on the part of the United States.  Specifically, the majority of Swan and Harris' unclean hands argument concerns the nominee liens which they characterize as "clandestine."  As discussed, the nominee liens are not relevant to the present action because the Government waived this theory.  In addition, Swan and Harris claim that the Sams Trust was a "front" or "co-conspirator" with the IRS so that Harris and Swan would take the Property subject to the tax liens.  Swan and Harris, however, fail to direct the Court to any portions of the record supporting this claim.

In sum, viewing the facts and all reasonable inferences in favor of the Government, Swan and Harris' unsupported allegations do not establish the affirmative defense of unclean hands. Therefore, this argument fails.

_____

[4]  In their Reply Brief, Swan and Harris bring additional arguments supporting their motion for summary judgment.  It is well-settled that arguments made for the first time in a Reply Brief are waived.  *Kelso v. Bayer Corp.,* 398 F.3d 640, 643 (7th Cir. 2005).

## B.      Equitable Estoppel

Next, Swan and Harris argue that the Court should estop the Government from enforcing the tax liens based on the Government's misconduct.  To invoke equitable estoppel against the Government, Swan and Harris must prove an affirmative act on the part of the Government that induces substantial reliance.  *See Schivarelli,* 355 Ill.App.3d at 103; *see also Bensman v. United States Forest Serv.,* 408 F.3d 945, 965 (7th Cir. 2005) (government must engage in affirmative misconduct, not mere negligence).  In support of their argument, Swan and Harris contend that the United States knowingly manufactured the current litigation and intended that Swan and Harris rely on this misconduct.

Again, Swan and Harris turn to their nominee lien arguments to support their allegations.  As discussed in detail above, the Government has waived its arguments concerning the nominee liens.  Further, Swan and Harris rehash their argument that the Sams Trust was a "front" or a "co-conspirator" with the IRS so that Harris and Swan would take the Property subject to the tax liens.  These allegations of the Government's "clandestine" misconduct are simply not supported by the record.  Accordingly, Swan and Harris' estoppel claim fails.[5]

## III.     Citimortgage's Motion for Summary Judgment

Last, Citimortgage bases its summary judgment motion on the premise that if there is no

---

[5]  In its Response Brief to Swan and Harris' summary judgment motion, the Government contends that Swan and Harris should be judicially estopped from arguing that the Townes never owned an interest in the Property based on the underlying state court proceedings.  The doctrine of judicial estoppel prevents a party who prevails in one lawsuit on a certain ground from repudiating that same ground in another lawsuit.  *See Jarrard v. CDI Telecomm., Inc.* 408 F.3d 905, 914 (7th Cir. 2005).  Here, the Government fails to sufficiently explain how this doctrine can apply to Swan and Harris, who were not parties to the underlying state court action.  As such, this argument is without merit.

factual basis for the nominee notices, the notices are void and of no effect to Citimortgage's mortgage. As discussed, because it is unclear what tax liens apply, the Court cannot determine whether Citimortgage's mortgage has priority over the United States' tax liens at this time.

## CONCLUSION

For these reasons, the Court denies the United States' Motion for Summary Judgment, Swan and Harris' Motion for Summary Judgment and Citimortgage's Motion for Summary Judgment.

Dated: July 21, 2005

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**