IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 04 C 3020 |
| THOMAS TOWNE, JOEN TOWNE, JANE HARRIS, PETER SWAN, and CITIMORTGAGE, INC., as assignee of FIRST ILLINOIS MORTGAGE, SERVICES, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff United States of America ("United States" or the "Government") sued Defendants Jane Harris and Peter Swan (collectively "Swan") seeking to secure Thomas and Joen Townes' (the "Townes" or "Taxpayers") federal income tax liability by foreclosing federal tax liens pertaining to real property located in Libertyville, Illinois. The Court held a bench trial on November 15, 2005.[1] For the reasons discussed below, the Taxpayers do not have any "property" or "rights to property" to the subject property to which the relevant federal tax liens can attach. Accordingly, the Government is not entitled to foreclose on the relevant tax liens and sell the subject property.

---

[1] On November 8, 2005, the Court entered Defendant Citimortgage, Inc.'s and Plaintiff United States' Agreed Judgment Order after they reached a settlement agreement. (R. 139-1.)

**BACKGROUND**

I.   **Procedural Background**

On October 5, 2004, the Court entered judgment in the amount of $329,336.10 against the Townes for their unpaid federal income tax liabilities for tax years 1988, 1989, 1991, 1993, 1994, 1995, 1996, and 1997. (R. 14-1.) Thereafter, the Government, Citimortgage, Inc., and Swan filed Cross-Motions for Summary Judgment. The Government argued that the Townes had property rights in the subject property to which the tax liens could attach even though the Townes had not held legal title to the property since 1987. On the other hand, Defendants argued that the Townes had no property rights to the subject property under Illinois law. The Court denied the Cross-Motions for Summary Judgment due in part to the parties' undeveloped and perfunctory arguments. *United States v. Towne,* No. 04 C 3020, 2005 WL 1705811, 96 A.F.T.R.2d 2005-5338 (N.D. Ill. July 21, 2005).

II.   **Findings of Fact**

Thomas and Joen Towne currently live in a house located at 29505 Oak Spring Lane, Libertyville, Illinois, that is the subject property (the "Property"). (R. 103-1, Stipulated Facts, ¶ 1.) Thomas Towne has lived in that Property since at least 1976, although he has not had legal title to the Property since 1987. (*Id.*) Home Federal Service Corporation held a mortgage on the Property and commenced a foreclosure proceeding on the Property in 1986. (*Id.* ¶ 2.) On March 10, 1988, Home Federal conveyed the Property's legal title to Sheldon "Jack" Shull. (*Id.* ¶ 3.) At the time of the conveyance, Shull and Thomas Towne were friends. (*Id.*)

Thomas Towne and Shull entered into a lease agreement in which Thomas Towne could remain living in the Property as long as he made certain payments. (*Id.* ¶ 4.) In 1999, Shull filed

an eviction action against Thomas Towne in the 19th Circuit Court, Lake County, Illinois, captioned *Shull v. Towne,* Case No. 99-LM-2339, because Thomas Towne failed to make the lease payments. (*Id.* ¶ 5.) In response, Thomas Towne filed a quiet title action against Shull in the 19th Circuit Court captioned *Towne v. Shull,* Case No. 99-CH-1350. (*Id.*) On January 30, 2001, the Illinois court entered an order resolving the Shull/Towne litigation. (*Id.* ¶ 6.)

On March 13, 2001, Mary Sams, Joen Towne's mother, acting through the Mary V. Sams Revocable Trust ("Sams Trust"), acquired title to the Property from Shull for $219,000. (*Id.* ¶ 7.) The Sams Trust financed the purchase by way of a loan from Prism Mortgage that was secured by a mortgage. (*Id.*) On or around March 15, 2001, the Townes entered into a lease agreement with the Sams Trust relating to the Property. (R. 108-1, Defs.' Proposed Findings of Fact, ¶ 9.) On September 20, 2002, the Sams Trust filed an action in the 19th Circuit Court seeking to evict the Townes from the Property captioned *Mary V. Sams, as Trustee of the Mary V. Sams Revocable Trust v. Thomas Towne,* 02-LM-1920. (R. 103-1, Stipulated Facts ¶ 8.) Defendant Peter Swan represented the Townes, who were the named defendants in the state court action. (*Id.* ¶ 9.)

On April 3, 2003, the parties reached a settlement agreement in the state court action, which was described by the Illinois state court judge, Terrence Brady, as follows:

> The first portion of the agreement is the fact that [the] Mary Sams Trust from this settlement agreement will receive the principal amount of $290,000.
>
> To effectuate that, the Townes would be given the exclusive right to sell the subject property, market it in any manner they choose for a four-month period beginning Monday [April 7, 2003].
>
> From that four-month marketing period and sale period, Mary Sams will be entitled to receive $290,000, plus any mortgage payments that she shall pay after June [1, 2003] ...

3

> ...
>
> After that four-month period the Mary Sams Trust shall have the exclusive right to market the property, and from that, sale proceeds received for $290,000, plus any monthly mortgage payments accrued.
>
> The Townes agree to fully cooperate during this period of time in which the Mary Sams Trust has the right to sell the property.
> ...
>
> At the sole discretion of the Mary Sams Trust, after the fourth-month period, [sic] shall additionally be entitled to possession of the property should she deem that to be her desire at that time.
>
> And to obtain that possession, the Trust shall be entitled to come before this Court requesting immediate order of possession, and the Defendants-Counterclaimants [Townes], herein waive the right to contest that possession.

(*Id.* ¶ 10, Ex. C at 3-5.) Further, under the settlement agreement, if the Townes sold the Property during the four-month period, the Sams Trust would get $296,000 and the Townes would get any amount over $296,000. (*Id.*, Ex. C at 7-8).

On August 1, 2003, the Townes entered into an agreement with Defendant Harris in which the Townes were given the right to live on the Property until August 30, 2005 and to formally acquire title to the Property from Swan and Harris by paying them $296,000.96, plus interests and other costs. (*Id.* ¶ 12.) Nonetheless, on August 5, 2003, the Sams Trust filed a motion in state court entitled "Motion for Order of Immediate Possession." (*Id.* ¶ 13.) On August 12, 2003 in the Circuit Court of Lake County, Judge Brady entered two orders granting the Sams Trust possession of the Property, but staying the enforcement of the order until August 15, 2003 and granting Swan forty-eight hours to close the sale of the Property and tender amounts to the Sams Trust. (*Id.* ¶ 14, Ex. D & E.) On August 13, 2003, Harris tendered a cashiers check in the amount of $296,000.96 to the Sams Trust attorneys. (*Id.* ¶ 15.) Along with

the check was a cover letter signed by Swan and a letter of direction signed by the Townes. (*Id.*) Of the $296,000.96 that went into the cashiers check, all of the money either came from Swan or his mother, Evelyn Swan. (*Id.* ¶ 16; R. 108-1, Defs.' Proposed Facts, ¶ 15.)

Although Harris tendered the payment under the terms of the real estate purchase agreement, the Sams Trust refused to tender the Property's title to Harris as Trustee of Trust #29505. (R. 108-1, Defs.' Proposed Facts, ¶ 16.) Thereafter, the Townes brought a motion in state court to enforce the settlement agreement. (*Id.* ¶ 17.) On August 27, 2003, Judge Brady conducted a hearing in state court regarding the Sams Trust's motion to stay the proceedings and the Townes' motion to enforce the settlement agreement. (*Id.* ¶ 23.) At that time, Judge Brady denied the motion to stay the proceedings and directed the Sams Trust to transfer the Property by a Trustees' Deed to Harris. (*Id.*) On September 3, 2003, the Sams Trust tendered the Trustees' Quit Claim Deed to Harris as Trustee of Trust #29505. (*Id.* ¶¶ 31, 32; R. 103-1, Stipulated Facts ¶ 17.) Swan and Harris are the only beneficiaries of Trust #29505. (R. 103-1, Stipulated Facts, ¶ 18.)

## ANALYSIS

The Government argues that although the Townes have not had legal title to the Property since 1987, they have a contingent right to the legal title to which the relevant tax liens can attach. A federal tax lien attaches to "all property and rights to property, whether real or personal," that belong to a taxpayer. *See* 26 U.S.C. § 6321; *United States v. National Bank of Commerce,* 472 U.S. 713, 719, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985). "The statutory language 'all property and rights to property,' appearing in § 6321 is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *National Bank*

5

*of Commerce,* 472 U.S. at 719-20 (parenthetical omitted). A federal tax lien, however, does not attach to property in which a taxpayer has no interest under state law. *See id.* at 722 (state law controls determination of legal interest taxpayer has in property); *Slodov v. United States*, 436 U.S. 238, 256, 98 S.Ct. 1778, 1790, 56 L.Ed.2d 251 (1978) ("the IRS is not given the power to levy on property in the hands of the taxpayer beyond the extent of the taxpayer's interest in the property").

To determine whether a taxpayer has "property" or "rights to property" under the federal tax lien statute, the Court first turns to Illinois law to "to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Drye v. United States,* 528 U.S. 49, 58, 120 S.Ct. 474, 145 L.Ed.2d 466 (1999); *see also United States v. Bess,* 357 U.S. 51, 55, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958) (federal tax lien statute "creates no property rights but merely attaches consequences, federally defined, to rights created under state law"). In *Drye,* the Supreme Court concluded that under Arkansas law, the taxpayer's right to channel his inheritance to a close family member constituted a property right under the federal tax lien statute. *Id.* at 61. Specifically, the Supreme Court held that because the taxpayer had the unqualified right to receive the entire value of his mother's estate, he had sufficient control over the property, and thus the federal tax liens could attach. *Id.* ("Arkansas law primarily gave Drye a right of considerable value – the right either to inherit or to channel the inheritance to a close family member").

A few years after the *Drye* decision, the Supreme Court reviewed a similar matter

concerning property rights under Michigan law. *See United States v. Craft,* 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002). In *Craft*, the Supreme Court further elucidated property rights in the context of the federal tax lien statute by describing state law property rights as a "'bundle of sticks' – a collection of individual rights which, in certain combinations, constitute property." *Id.* at 278 (citing B. Cardozo, Paradoxes of Legal Science 129 (1928)). "State law determines only which sticks are in a person's bundle." *Id.* "Whether those sticks qualify as property for purposes of the federal tax lien statute is a question of federal law." *Id*. at 278-79. The *Craft* Court further articulated that when determining property rights under state law, courts "must be careful to consider the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them." *Id.* at 279.

The *Craft* case involved the application of Michigan law concerning "tenancy by the entirety." *Id*. at 281-82 ("tenancy by the entirety is a unique sort of concurrent ownership that can only exist between married persons"). The Supreme Court determined that a tenant by entirety has many essential rights to the use of property, namely, to receive income produced from the property and to exclude others from it. *Id.* The Supreme Court further recognized that the tenant by entirety also had the right to alienate or otherwise encumber the property, that is, to "dispose" of the property with the consent of his wife, along with the right to survivorship. *Id.* at 283-84. Based on the tenant in entirety's various property rights as described above, the *Craft* Court concluded that the husband had "property rights" under Section 6321, although he could not unilaterally alienate the property. *Id.* at 284-85. In making its determination, the *Craft* Court looked to the breadth of control the taxpayer exercised over the property and concluded that the husband had a "a substantial degree of control" over the subject property. *See id.* at 283.

7

**I.      Property Rights Under Illinois Law**

The Government argues that the Townes' bundle of sticks, that is, state-delineated property rights, emanate from the April 3, 2003 state court settlement and the state court judge's August 12, 2003 order in which the court granted Swan forty-eight hours to close the sale of the Property and tender the amounts to the Sams Trust. Specifically, the Government argues that "at least as of the April 3, 2003 state court order, the Taxpayers had the following rights: the right to control who would receive the legal title to the subject property from the Sams Trust so long as $296.00.96 was paid, as well as the right to demand any amount of consideration of the title that they could obtain if they elected to have title transferred to someone other than themselves." (R. 104-1, United States' Trial Brief, at 6.) Furthermore, the Government contends that under the August 12, 2003 state court order "the Taxpayers had 48 hours to cause the Sams Trust to be paid $296,000.96; if the Taxpayers failed to do so, then the Sams Trust had the right to evict the Taxpayers and sell the property, and give any proceeds over $296,000.96 to the Taxpayers; if the Taxpayers caused the Sams Trust to be paid the $296,000.96, then the Sams Trust was to tender a deed to the Taxpayers, or as directed by the Taxpayers." (*Id.*) The Government also explains that "the August 12, 2003 state court order effected no substantive change to the Taxpayers' 'bundle of sticks,' other than to extend the Taxpayers' right to contingent control over the legal title of the property." (*Id.*)[2]

As the *Craft* decision directs, the Court must set aside labels when determining whether

---

[2] The Government also argues that prior to the April 3, 2003 settlement agreement, the Townes had a "bundle of rights" under Illinois law based on the Townes' lease agreement with Shull. The Government, however, has not set forth sufficient evidence establishing the facts necessary to its argument.

8

the Townes had any "property rights" to the Property under Illinois law. *See Craft,* 535 U.S. at 279. Here, the Government concedes that the facts in this case do not fit traditional theories of property rights under Illinois law. More specifically, the Government is not claiming "that the Taxpayer ever signed a formal real estate contract with the Sams Trust" nor "do we claim that the Taxpayer and Swan ever had a formal contract for the sale of the real estate." (R. 80-1, United States Resp. to Defs.' Mot. to Clarify, at 5.) "Finally, we concede that the parties did not intend that the Taxpayer have title in his name." (*Id.*) The Government argues, however, that Judge Brady in his April 3, 2003 and August 12, 2003 orders, recognized the Townes' "bundle of sticks."

The Government's argument is flawed for several reasons. The Supreme Court explicitly directs federal courts to look to state law, not to state court orders, when determining if a taxpayer has "property" or "rights to property." *See Drye*, 528 U.S. at 58 ("We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach"); *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960) ("state law controls in determining the nature of the legal interest which the taxpayer had in the property"). Furthermore, the Government must have some basis in Illinois law to support its argument that the Townes have rights to the Property. *See Craft,* 535 U.S. at 278-79. Indeed, at trial the Government admitted that the *Craft* decision directs federal courts to look at the "contours" of state law, yet the Government fails to articulate what those contours are.[3]

---

[3] In its closing argument, the Government stated: "I'm not really sure what label state law would attach to these rights that the Townes have as of the April 3, 2003 settlement agreement. I don't know what those rights should be called, a contract or maybe an option...." (Trial Tr., Nov. 15, 2005, afternoon session). The Court rejected the Government's option argument at summary judgment. (*See* R. 74-1, Mem. Opinion & Order, at 16.) Specifically,

9

Although the state court orders addressed certain rights the Townes had, they did not give him property rights to the Property as defined under Illinois law.

Nonetheless, the Court turns to the April 2, 2003 settlement agreement and the August 12, 2003 court order under which the Townes had "the exclusive right to sell the subject property, market it in any manner they choose for a four-month period." The parties characterize this "right" as the right to market the Property or the power to direct the Property's title.

Under Illinois law, the right to exclusively market property does not amount to an interest in real or personal property. *See, e.g., Foxfield Realty, Inc. v. Kubala,* 287 Ill.App.3d 519, 523, 223 Ill.Dec. 52, 678 N.E.2d 1060 (Ill.App.Ct. 1997) (exclusive right-to-sell agreement conferred right to commission); *Davito v. Blakely,* 96 Ill.App.2d 196, 202, 238 N.E.2d 410 (Ill.App.Ct. 1968) (real estate broker employed to find purchaser for property; broker does not have authority to execute contract binding owner). Indeed, the Government does not point to any Illinois law supporting the proposition that the Townes' right to exclusively market the Property conferred property rights on the Townes and the Court has found none.

Next, the power of direction does not confer any property rights upon the Townes. Under Illinois law, the power of direction is in the context of an Illinois land trust. *See* 765 ILCS 430/1. "In an Illinois land trust, legal and equitable title to real property is held by the trustee and the interest of the beneficiary is personal property. Thus, the trustee is the absolute owner of real estate." *Estate of Mendelson,* 298 Ill.App.3d 1, 3, 232 Ill.Dec. 280, 697 N.E.2d 1210

---

under Illinois law, an option is not a sale or a contract of sale and does not convey legal title, thus an optionee does not have interest in the property until he exercises his option to purchase the property. *See Fried v. Barad,* 175 Ill.App.3d 382, 391, 125 Ill.Dec. 175, 530 N.E.2d 93 (Ill.App.Ct. 1988). Again, there is no evidence that the Sams Trust and the Townes entered into an option agreement and that the Townes exercised any such option to the Property.

10

(Ill.App.Ct. 1998) (citations omitted). Illinois land trusts are created by a written document that controls the relationship of the parties. *In re Estate of Wittmond,* 314 Ill.App.3d 720, 724, 247 Ill.Dec. 604, 732 N.E.2d 659, 662 (Ill.App.Ct. 2000). Under an Illinois land trust, the beneficiary has: (1) "the exclusive right to direct the trustee in dealing with title;" (2) "the exclusive control of the management and operation of trust property;" and (3) "the exclusive right to the earnings and proceeds of the property." *Espevik v. Kaye,* 277 Ill.App.3d 689, 694, 214 Ill.Dec. 360, 660 N.E.2d 1309 (Ill.App.Ct. 1996).

Here, the facts are not analogous to an Illinois land trust because there is no evidence that the Sams Trust and the Townes entered into a written agreement allowing the Townes to have the exclusive right to the earnings and proceeds of the property. *See id.* at 694. Specifically, because the April 3, 2003 court order allowed for the Sams Trust to receive proceeds from the sale of the Property, namely $290,000, plus any mortgage payments, the Taxpayers did not have exclusive rights to the proceeds of the Property as required under Illinois land trust law.

Accordingly, the record does not support a finding that the Townes had any rights to the Property based on Illinois law. In other words, because Illinois law does not recognize any interest described by the Government as "property" or "rights to property," the Taxpayers did not have any state-delineated property rights to which the relevant federal tax liens could attach.

**II.      Property Rights Under Federal Tax Lien Statute**

Assuming, *arguendo,* that the United States had established that the Townes have a state-created property interest, the Court will examine whether the Government's description of the Townes' "bundle of sticks" constitutes "property" or "rights to property" under Section 6321. This inquiry is factually specific and includes an evaluation of the Townes' ability to transfer the

Property, the pecuniary value the Townes have in the Property, and the Townes' overall control of the Property. *See United States v. Murray,* 217 F.3d 59, 63 (1st Cir. 2000) (citing *Drye,* 528 U.S. at 60-61). Indeed under *Craft* and *Drye,* the Court's inquiry must focus on the taxpayer's control over the subject property. *See Craft*, 535 U.S. at 283 (taxpayer exercised "substantial degree of control" over property); *Drye,* 528 U.S. at 61 (property rights must be unqualified); *see also National Bank of Commerce,* 472 U.S. at 725 ("unqualified contractual right to receive property is itself a property right subject to seizure by levy") (citation omitted).

Here, the April 3, 2003 and August 12, 2003 state court orders gave the Townes rights that were qualified, that is, rights subject to the Sams Trust's considerable control over the Property. Specifically, although the Townes may have had the exclusive right to market or direct the Property's title, it was only for a four-month period after which the Sams Trust gained the exclusive right to market the property. In addition, the Taxpayers had the right to direct who would receive legal title to the Property "so long as the $296,000.00 was paid" – a significant contingency that restricted the Townes' control over the Property. As discussed, during the four-month period, the Townes were not entitled to the entire proceeds of the sale of the Property. Instead, the Townes had the right to any amount over $290,000, and thus the settlement agreement restricted their pecuniary interest in the Property.[4] Finally, as the Government argued, the August 12, 2003 state court order provided that "the Taxpayers had 48 hours to cause the Sams Trust to be paid $296,000.96; if the Taxpayers failed to do so, then the Sams Trust had

---

[4] The Government argues that the Townes had "equity" in the Property, but fails to develop its argument with supporting evidence and legal authority. Thus, the Government's argument is waived. *See Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived").

the right to evict the Taxpayers and sell the property." The right to evict the Townes from the Property further evidences the Sams Trust's control over the Property. In other words, the Townes' lease agreement to live on the Property did not give the Townes the requisite amount of control over the Property because they were subject to eviction. In sum, the Townes' ability to control and transfer the Property was severely limited.

Under these circumstances, the Court would be hard-pressed to conclude that the Townes' rights to the Property were unqualified because the Sams Trust – not the Townes – maintained a substantial degree of control over the Property. *See Drye,* 528 U.S. at 61 (because taxpayer had unqualified right to receive entire value of mother's estate, he had sufficient control over the property). Put another way, the settlement agreement and subsequent August 12, 2003 court order severely restricted any property rights the Townes may have had in the Property. *See National Bank of Commerce,* 472 U.S. at 724 (taxpayer had absolute, unrestricted right under Arkansas law to compel payment of outstanding balances in joint bank accounts). Hence, whatever rights the April 3, 2003 and August 12, 2003 state court orders conferred upon the Townes, such rights were not "property" or "rights to property" under the federal tax lien statute because the Townes did not exercise the requisite degree of control over the Property. *See Craft*, 535 U.S. at 283; *Drye,* 528 U.S. at 61; *see also Murray,* 217 F.3d at 63.

Nevertheless, the Government argues that the Court should follow several circuit court cases decided before the Supreme Court decisions in *Craft*, *Drye,* and *National Bank of Commerce* that stand for the proposition that federal tax liens may attach to contingent rights to legal title. *See, e.g., Randall v. Nakashima & Co., Ltd.,* 542 F.2d 270 (5th Cir. 1976). In *Randall,* the Fifth Circuit concluded that a taxpayer's rights in a partially executed contract were

13

"property" or "rights to property" such that the federal tax lien attached before the taxpayer conveyed his contract rights. *Id.* at 271. In making this determination, the Fifth Circuit examined Alabama commercial law that defined contract rights, including the distinction that contract rights were considered "property rights" under Alabama law. *Id.* at 273-74. Indeed, in the other circuit court cases cited by the Government, the courts initially determined that there was a contingent property right based on state law before turning to the federal tax lien statute. *See, e.g.*, *Kirby v. United States*, 329 F.2d 735, 736-37 (10th Cir. 1964) (applying Kansas law); *United States v. Hubbell*, 323 F.2d 197, 200 (5th Cir. 1963) (applying Texas law); *Seaboard Surety Co. v. United States,* 306 F.2d 855, 858 (9th Cir. 1962) (applying Washington law); *see also Atlantic Nat'l Bank. v. United States,* 536 F.2d 1354, 1356-57 (Ct. Cl. 1976) (tax liens attached to taxpayer's after-acquired property regarding government contract). As such, the Government's reliance on these cases is misplaced because there is no basis in Illinois law that the Taxpayers had rights to the Property in the first instance.

### III. Nominee Theory

In the alternative, the Government contends that the Sams Trust was the nominee of the Taxpayers, and thus the United States may foreclose the federal tax liens on the Property. Without question, the federal tax lien statute reaches equitable interests owned for the benefit of the taxpayer in property that is titled in the name of a nominee or alter ego. *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 350-51, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977). Simply put, a nominee is a person who holds legal title to property for the benefit of someone else. *See Scoville v. United States,* 250 F.3d 1198, 1202 (8th Cir. 2001) (citation omitted). Whether a titleholder is a nominee depends on the facts and circumstances of each case, including whether:

(1) a close personal relationship exists between the nominee and the transferor; (2) the nominee paid little or no consideration for the property; (3) the parties placed the property in the name of the nominee in anticipation of collection activity; (4) the parties did not record the conveyance; and (5) the transferor continues to exercise dominion and control over property. *See United States v. Schaut,* No. 97 C 4114, 2005 WL 1665314, at *3, 89 A.F.T.R. 2d 2002-309 (N.D. Ill. Dec. 28, 2001); *United States v. McCullough,* No. 92 C 4074, 1994 WL 374471, at *3, 73 A.F.T.R.2d 94-2256 (S.D. Ill. May 1994).[5]

The key to the Court's analysis under the Government's nominee theory is whether the transferor had control over the Property. *See Shades Ridge Holding Co. v. United States,* 888 F.2d 725, 728 (11th Cir. 1989). Here, the transferor is Sheldon Jack Shull, not the Townes, and although the Government argues that the Court should look past the "real owner" and consider who is "calling the shots" – presumably Thomas Towne – the Government has not provided any legal authority that would allow the Court to do so.

The Court looks to the nominee factors as they apply to Shull and the Sams Trust. First, although there is no doubt that there was a close personal relationship between the Sams Trust

---

[5] The parties do not cite Illinois law when discussing the Government's nominee theory. In addition, Court finds no guidance from the Illinois courts concerning the nominee theory, although Illinois law provides for the theory of equitable conversion which occurs "when the owner enters into a valid and enforceable contract for the sale of realty, the seller continues to hold legal title, but in trust for the buyer" and "the buyer becomes the equitable owner and holds the purchase money in trust for the seller." *In re Estate of Martinek,* 140 Ill.App.3d 621, 628, 94 Ill.Dec. 939, 488 N.E.2d 1332 (1986) (citing *Shay v. Penrose*, 25 Ill.2d 447, 449-50, 185 N.E.2d 218 (Ill. 1962)). The Government, however, has unequivocally stated that it is not relying on the theory of equitable conversion. (R. 80-1, U.S. Resp. to Defs.' Mot. to Clarify, at 5.) Thus, the Court looks to the decisions of other federal courts for guidance regarding the Government's nominee theory. *See Spotts v. United States,* ___ F.3d ___, 2005 WL 3029079, at *4 (6th Cir. Nov. 14, 2005).

and the Taxpayers because the Trustee for the Sams Trust was Joen Towne's mother, the Taxpayers were not the "transferors" under the circumstances. Instead, Shull was the transferor, and there is no evidence that Shull had a close, personal relationship with Mary Sams or the Sams Trust. Further, the Sams Trust paid Shull $219,000 for the Property which is valuable consideration. In fact, the Sams Trust took out a mortgage for which the Sams Trust, and not the Townes, were responsible. In addition, there was no evidence presented at trial that the Townes paid any part of the consideration for the purchase of the Property from Shull. Likewise, the Government did not present any evidence as to whether the Sams Trust and Shull placed the property in the name of the Sams Trust in order to avoid collection activity. Indeed, it is undisputed that the parties recorded the conveyance. Finally, the Government did not present any evidence regarding Shull's control over the Property after he conveyed the Property to the Sams Trust. As such, the Government's nominee theory fails.

Because the Government has not established that the Townes had any rights to the Property through its nominee theory, the Court need not determine whether the federal tax liens attached to any such property rights under Section 6321. Moreover, because the Townes had no property interests to which the tax liens can attached, the Court need not address Swan's estoppel and unclean hands arguments.

## CONCLUSION

The Taxpayers do not have any "property" or "rights to property" to the subject property to which the relevant federal tax liens can attach. Accordingly, the Government is not entitled to foreclose on the relevant tax liens and sell the subject property.

Dated: November 30, 2005

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**